STATE of Minnesota, Respondent,

v.

John Dexter PRIDE, Petitioner, Appellant.

No. C5–93–883.

Supreme Court of Minnesota.

March 24, 1995.

Jarett B. Decker, Maun & Simon, St. Paul, for appellant.

Hubert H. Humphrey, III, Atty. Gen., St. Paul, and Michael O. Freeman, Hennepin County Atty., Linda K. Jenny, Asst. County Atty., Minneapolis, for respondent.

## OPINION

PAGE, Justice.

John Dexter Pride was convicted of fifth-degree criminal sexual conduct [1] by a Hennepin County District Court jury for nonconsensual sexual contact with Jodi Rogers, his former employee. The conviction was based

---

1. "A person is guilty of criminal sexual conduct in the fifth degree if the person engages in non-consensual sexual contact." Minn.Stat. § 609.3451, subd. 1 (1994).

on Rogers' claim that Pride had grabbed her in the area of her crotch. At his trial, Pride sought to cross-examine Rogers and Matthew Seguilia, the Minneapolis police officer with whom Rogers filed her complaint, about Rogers' and Seguilia's romantic relationship. The purpose of this cross-examination was to establish Rogers' motive to fabricate the incident and Seguilia's interest in the outcome of the case. The trial court prohibited the cross-examination after concluding that evidence of Rogers' and Seguilia's romantic relationship was more prejudicial than probative. The court of appeals affirmed Pride's conviction in an unpublished decision. Pride raises one issue for our review:[2] whether the trial court violated his rights under the Confrontation Clause of the Sixth Amendment to the United States Constitution by prohibiting him from cross-examining Rogers and Seguilia regarding their romantic relationship. We reverse the court of appeals and remand for a new trial.

Pride owned and operated a business which organized recreational activities and sports leagues by contract with Twin Cities area employers. In the summer of 1991, while Rogers was employed by Pride as a volleyball referee, they became friends. As part of their friendship, each engaged in playful teasing of a sexual nature. Rogers' employment ended in the fall of 1991 when Pride did not invite her back to referee during the winter. Although initially angered by the way her employment ended, Rogers played volleyball in the league during the winter of 1991–92 and again in June 1992.

Rogers and Pride gave different versions of the events leading to Rogers' allegations against Pride. According to Rogers, on June 22, 1992, while playing in the first of two volleyball games, she cut her finger on the net. The cut caused substantial bleeding and left blood on her shirt, shorts, and legs. Rogers went to Pride's office after the last game, where she found Pride and two other volleyball players, Tim Turnquist and Bob Pelletier. Pride invited her out for a beer.

After she declined the invitation, Pride said to her, "Look at you standing there all tan in your tight little pants and your blood dripping your down [sic] like you just had your period." She responded, "That's gross and I don't need to sit and listen to this," and immediately left the office. She commented to Turnquist, who by then was standing outside the office, that she was leaving because, "I don't need someone to make me feel that way." Rogers, walking with Turnquist and Pelletier, went directly to her car and began driving away. When she saw Pride running towards her car calling her name, she stopped because she thought Pride was going to apologize for his comment. Pride leaned against the car's roof with his right hand, and again asked her to go out for a beer. When she refused, he reached in the car with his left hand, grabbed her crotch, and quickly pulled his arm out of the car. Rogers looked at him and said, "Don't ever fucking touch me again," and drove away.

Rogers went home, took a shower, and changed clothes. She then went to a gas station where she knew Minneapolis Police Officer Matthew Seguilia would be working. Another Minneapolis police officer, whom she was dating at the time of the incident with Pride, had introduced her to Seguilia. She went to see Seguilia because she trusted him and felt comfortable telling him what Pride had done. She asked him how to file a report about the incident. After he told her, she decided not to file a report and left for home. Before reaching home, she changed her mind, drove back to the gas station and filed a report with Seguilia.

Pride's version of what took place varies significantly from Rogers' version. According to Pride, he was in his office talking with Turnquist when Rogers entered. Pelletier was also present. Pride asked all three if they were interested in going out for some beers. While he included Rogers in the invitation, it was not directed at her exclusively. Pride joked about the blood on Rogers' cloth-

**2.** Although the state requested that the trial court sentence Pride to 60 days in the workhouse, the court sentenced him to 100 days in the workhouse, 55 of which were stayed for two years pending his compliance with the probation department's treatment recommendation, compliance with the court's order prohibiting him from contact with Rogers, and payment of a $500 fine. Pride did not appeal his sentence.

ing and legs, saying, "It looks as though it might be that time of the month." Rogers left the trailer five to ten minutes after he made that remark. Later, as he went to lock the rest room, Rogers' car approached and stopped in front of him. He leaned against the car and they talked about a mutual friend. As their conversation ended, he said in jest, "Get the hell off of my property," and she responded, "You fag." He then play punched her in the shoulder with his left hand and jumped back from the car. Pride claims he did not touch her in or near the area of her crotch.

Turnquist also testified at trial. He could not recall Pride specifically asking Rogers if she wanted to have a beer, but remembered Pride making general comments to everyone present about going to have a beer. Turnquist testified that Pride referred to the blood on Rogers' leg "looking like it was that time of the month for her and that he found it attractive." Turnquist was not surprised that Pride made the remark, "given the nature of their relationship." Although he did not remember Rogers' initial reaction, Turnquist testified Rogers remained in the office for five minutes after Pride made the remark. He also recalled that later, while he, Rogers, and Pelletier were outside smoking, Rogers mentioned she was upset and offended by the remark. At some point, Turnquist, Rogers, and Pelletier walked to their cars together. Rogers got into her car and he and Pelletier got into his car. As Turnquist was driving away, he stopped behind Rogers' car, where he saw Pride and Rogers talking. He testified he saw Pride jump away from the car after making a motion consistent with pulling his hand out of the car. He did not see how far Pride's arm went into the car, but he noted that Rogers drove away very quickly.

Seguilia testified he was working as a security guard at a gas station on June 22 when Rogers stopped by, appearing nervous and upset. Rogers asked him about the procedures for filing a complaint against someone and about subsequent steps in the judicial system. When he asked what was bothering her, Rogers told him that Pride had grabbed

her crotch and made a remark about her period. Seguilia testified Rogers initially declined to file a report and left the gas station, but returned shortly thereafter and told him she changed her mind. Seguilia arranged for a squad car to deliver the necessary paperwork and then took the report from Rogers.

Pride's theory of the case was that Rogers fabricated the incident in an effort to move her relationship with Seguilia from friendly to romantic, and that once successful, she had to maintain the story to preserve the relationship. Thus, Pride believed that evidence of their romantic relationship was probative of: (1) Rogers' motive to fabricate the incident, (2) Rogers' motive to maintain the fabricated story, and (3) Seguilia's interest in the outcome of the case. Over Pride's objection, the trial court excluded all evidence of Rogers' and Seguilia's romantic relationship. The trial court concluded that evidence of the romantic relationship was more prejudicial than probative and limited cross-examination to the status of their relationship at the time Seguilia took the report from Rogers.[3]

 A criminal defendant has a guaranteed right "to be confronted with the witnesses against him." U.S. Const. amend. VI. The Confrontation Clause applies to criminal defendants in state proceedings through the Fourteenth Amendment. *Pointer v. Texas,* 380 U.S. 400, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965). " 'The main and essential purpose of confrontation is *to secure for the opponent the opportunity of cross-examination.*' " *Davis v. Alaska,* 415 U.S. 308, 315–16, 94 S.Ct. 1105, 1110, 39 L.Ed.2d 347 (1974) (quoting 5 J. Wigmore, *Evidence* § 1395, at 123 (3d ed. 1940)) (emphasis in original). Subject to the trial court's right to reasonably limit questioning, "the cross-examiner has traditionally been allowed to impeach, i.e., discredit, the witness" by revealing to the jury the possible biases and ulterior motives of the witness being cross-examined. *Id.* at 316, 94 S.Ct. at 1110. Thus, "the exposure of a witness' motivation in testifying is a proper and important function of the constitutionally protected right of cross-examination." *Id.*

---

**3.** According to Rogers and Seguilia, at the time of the report, they were just friends.

[A] criminal defendant states a violation of the Confrontation Clause by showing that he was prohibited from engaging in otherwise appropriate cross-examination designed to show a prototypical form of bias on the part of the witness, and thereby "to expose to the jury the facts from which jurors * * * could appropriately draw inferences relating to the reliability of the witness."

*Delaware v. Van Arsdall*, 475 U.S. 673, 680, 106 S.Ct. 1431, 1436, 89 L.Ed.2d 674 (1986) (quoting *Davis v. Alaska*, 415 U.S. at 318, 94 S.Ct. at 1111).

In *Olden v. Kentucky*, 488 U.S. 227, 109 S.Ct. 480, 102 L.Ed.2d 513 (1988), the Supreme Court found a Confrontation Clause violation where the trial court prohibited the defendant from questioning the complainant, who was white, and her African–American lover about their romantic relationship at the time of the alleged rape and at the time of trial. *Id.* at 230–31, 109 S.Ct. at 482–83. The defendant intended to use that evidence to expose the lover's bias and to argue the complainant fabricated a story about forcible rape and sodomy to protect her relationship with her lover, who had seen her getting out of a car in which the defendant was a passenger. *Id.* The Kentucky Court of Appeals had upheld the exclusion of the evidence on grounds that the potential prejudice caused by revealing the couple's interracial relationship outweighed the probative value of the evidence. *Id.* at 230, 109 S.Ct. at 482. The Supreme Court reasoned that the exclusion of the evidence was "beyond reason" and noted that "[s]peculation as to the effect of jurors' racial biases cannot justify exclusion of cross-examination with such strong potential to demonstrate the falsity of [the complainant's] testimony." *Id.* at 232, 109 S.Ct. at 483.

In *State v. Elijah*, 206 Minn. 619, 289 N.W. 575 (1940), we held the defendant's Confrontation Clause rights were violated when the defendant was prohibited from questioning a corroborating witness about the witness' intimate relationship with and desire to marry the complainant. We reasoned the trial court "unduly restrict[ed]" the defendant's right of cross-examination because the prohibited questions were relevant to the witness' interest in the complainant and the outcome of the trial, both of which affected the witness' credibility. *Id.* at 626, 289 N.W. at 579.[4]

▮▮▮ Prohibiting a criminal defendant's cross-examination where that cross-examination is designed to expose a prosecution witness' bias or motivation in testifying is error. *Delaware v. Van Arsdall*, 475 U.S. at 677–78, 106 S.Ct. at 1434–35. Here, the prohibited cross-examination had the potential to demonstrate Rogers' ulterior motives and Seguilia's interest in the outcome of the trial and, had it been permitted, the "jury might have received a significantly different impression of [their] credibility." *Id.* at 680, 106 S.Ct. at 1435. Thus, the evidence to be adduced from that cross-examination had some probative value and would have exposed facts about Rogers and Seguilia "from which jurors * * * could appropriately draw inferences relating to the reliability" of their testimony. *Davis v. Alaska*, 415 U.S. at 318, 94 S.Ct. at 1111.

Informing the jury that Rogers and Seguilia were merely friends had the potential to mislead the jurors and did not give them a complete picture of Rogers' possible motive to fabricate her charges against Pride or Seguilia's interest in the outcome of the case. Jurors, like anyone, are unlikely to believe a witness has testified falsely or otherwise colored her testimony unless they are aware of

---

4. It is the essence of a fair trial that reasonable latitude be given the cross-examiner, even though he is unable to state to the court what facts a reasonable cross-examination might develop. Prejudice ensues from a denial of the opportunity to place the witness in his proper setting and put the weight of his testimony and his credibility to a test, without which the jury cannot fairly appraise them. To say that prejudice can be established only by showing that the cross-examination, if pursued, would necessarily have brought out facts tending to discredit the testimony in chief, is to deny a substantial right and withdraw one of the safeguards essential to a fair trial. *Alford v. United States*, 282 U.S. 687, 692, 51 S.Ct. 218, 219, 75 L.Ed. 624 (1931) (citations omitted), *quoted in State v. Elijah*, 206 Minn. at 625, 289 N.W. at 579.

a reason for that person to do so. *Elijah,* 206 Minn. at 626, 289 N.W. at 579.

Finally, there has been no showing, either before the district court or at oral argument before this court, that evidence of Rogers' and Seguilia's romantic relationship was more prejudicial than probative,[5] much less that its probative value was "substantially outweighed" by the danger of prejudice. Minn.R.Evid. 403. Indeed, the state, in its brief to this court, does not respond to Pride's assertion that such evidence was not prejudicial.

"Cross-examination to show the bias, prejudice, interest or disposition of the witness to tell the truth is a matter of right, the exercise of which is indispensable to show the truth." *Elijah,* 206 Minn. at 624, 289 N.W. at 578. In light of Pride's constitutional right to elicit evidence probative of a witness' credibility, and the apparent lack of prejudice to the state's case from the evidence, Pride's cross-examination to elicit that evidence would have been appropriate. *Delaware v. Van Arsdall,* 475 U.S. at 680, 106 S.Ct. at 1435. "The importance of ascertaining the motives which improperly or corruptly influence a witness is so manifest that it ought not * * * be necessary to do more than suggest the question." *Elijah,* 206 Minn. at 626, 289 N.W. at 579. Denying Pride the opportunity to challenge Rogers' and Seguilia's credibility was error.

Our decision should not be taken as a comment on or an evaluation of either Rogers' or Seguilia's credibility or veracity. That evaluation is for the jury based on all relevant and admissible evidence. We simply state that evidence of Rogers' and Seguilia's romantic relationship should have been admitted to give the jury as much relevant evidence as possible to make that evaluation. Further, our decision should not be taken as affecting our prior holdings regarding cross-examination of a victim with respect to sexual history.

 Confrontation Clause errors are subject to harmless error analysis. *Dela-*

*ware v. Van Arsdall,* 475 U.S. at 684, 106 S.Ct. at 1438.

The correct inquiry is whether, assuming that the damaging potential of the cross-examination were fully realized, a reviewing court might nonetheless say that the error was harmless beyond a reasonable doubt. Whether such an error is harmless in a particular case depends upon a host of factors, * * * includ[ing] the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case.

*Id.*

Here, Rogers' and Seguilia's testimony, and thus their credibility, was critically important to the state's case. There was conflicting evidence as to the events surrounding Rogers' allegations, and there was no evidence to corroborate Rogers on the key issue in dispute—whether Pride grabbed her crotch. Assuming that the damaging potential of the cross-examination were fully realized, we cannot say that its exclusion was harmless beyond a reasonable doubt. We therefore reverse the court of appeals and remand for a new trial.

Reversed and remanded for a new trial.

KEITH, Chief Justice (concurring specially).

Although I concur in the result reached by the majority, I wish to express my concern regarding the scope of today's decision. In particular, I caution that the majority opinion should not be interpreted as expanding the opportunity for defendants to cross-examine their alleged victims regarding speculative theories of bias or motive. In reviewing this case, we should be mindful of our past holdings that limit the introduction of evidence of a victim's sexual conduct that is remote and of extremely limited relevance. *See, e.g. State v. Dornack,* 329 N.W.2d 839 (Minn.

---

5. At the hearing before the trial court, counsel for Pride made it clear he did not intend to ask

questions regarding the sexual nature of their relationship.

1983). Indeed, our own "rape shield" law embodies an intent to protect victims of sexual assault from the unnecessary admission of evidence regarding the victim's prior sexual conduct. Minn.Stat. § 609.347, subd. 3 (1994). To now open the door to broad cross-examination regarding a victim's romantic affections runs contrary to this intent.

In this case, however, we are presented with a very unique situation that compels our holding. Specifically, no physical evidence was presented in this case, and the jury's determination rests purely on the credibility of the defendant and the alleged victim. Further, the testimony of the only other witness does not shed light on the pivotal fact question in this case: whether the defendant engaged in nonconsensual sexual contact by grabbing Rogers' crotch. Regardless of whether we find defendant's theory of bias particularly compelling, the testimony regarding Rogers' romantic interests was critical to the defendant's ability to attack Rogers' credibility. Under these extremely narrow circumstances, the trial court violated the defendant's rights under the Confrontation Clause when it prohibited defendant from cross-examining Rogers and Officer Seguilia regarding their romantic involvement.

TOMLJANOVICH, Justice (dissenting).

I respectfully dissent. I do not believe the defendant's rights under the Confrontation Clause of the Sixth Amendment were violated when the trial court refused to permit cross-examination of Ms. Rogers and Officer Seguilia as to whether a romantic relationship had developed between them after Ms. Rogers reported the assault.

The trial judge ruled that the evidence was more prejudicial than probative. Before we get to that balancing, however, our first inquiry must be whether the evidence was relevant. " 'Relevant evid nce' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Minn.R.Evid. 401.

The defense theory presented to the jury in final argument was that Ms. Rogers wanted to "get close" to an officer and the report

of the assault was "a way to facilitate further contact with [Officer Seguilia]." Hence, her credibility was subject to attack. Perhaps I have been away from the dating game for too many years, but surely there are more enticing ways to "get close" to an officer or to facilitate further romantic contact than to report an alleged sexual assault.

The jury was fully apprised of the relationship between Ms. Rogers and Officer Seguilia at the time she made the initial report of the sexual assault. What may or may not have developed between them later does not have a tendency to make existence of any fact *that is of consequence* more or less probable. The subsequent relationship is simply of no consequence.

I heartily agree with the majority that the exposure of a witness' motivation in testifying is a proper and important function of the constitutionally protected right of cross-examination, but surely the Confrontation Clause does not require cross-examination to support any theory no matter how far fetched.

It does not follow, of course, that the Confrontation Clause of the Sixth Amendment prevents a trial judge from imposing any limits on defense counsel's inquiry into the potential bias of a prosecution witness. On the contrary, trial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant. And as we observed earlier this Term, "the Confrontation Clause guarantees an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish."

*Delaware v. Van Arsdall,* 475 U.S. 673, 679, 106 S.Ct. 1431, 1435, 89 L.Ed.2d 674 (1986) (quoting *Delaware v. Fensterer,* 474 U.S. 15, 20, 106 S.Ct. 292, 294, 88 L.Ed.2d 15 (1985) (*per curiam* ) (emphasis in original)).

I would affirm the court of appeals.

GARDEBRING, Justice (dissenting).

I join in the dissent of Justice Tomljanovich.

STRINGER, Justice (dissenting).

I join in the dissent of Justice Tomljanovich.