**STATE of Minnesota, Appellant,**

v.

**Lyf Christian WILDENBERG, Respondent.**

No. CX–96–652.

Supreme Court of Minnesota.

Jan. 28, 1998.

Mark Nathan Lystig, Asst. Ramsey County Atty., Hubert H. Humphrey III, Atty. Gen., for appellant.

Birrell & Dunlap, Ltd., Andrew S. Birrell, Ian A. J. Pitz, Minneapolis, for respondent.

## OPINION

STRINGER, Justice.

Lyf Christian Wildenberg ("Wildenberg") claims his Sixth Amendment constitutional right of confrontation was denied when personal journals of K.A., the victim of an alleged sexual assault, were ruled by the trial court to be irrelevant and therefore nondiscoverable in Wildenberg's trial for criminal

sexual conduct pursuant to Minn.Stat. § 609.342, subd. 1(g) (1992). The court of appeals agreed with Wildenberg and reversed concluding that the trial court erred in its ruling, and that the error was prejudicial because the trial court allowed the jury to hear a taped conversation between K.A. and Wildenberg with multiple references by K.A. to the contents of her journals, but would not allow Wildenberg to cross-examine her regarding the contents of the journals or to inquire if, in fact, the journals existed. We affirm the court of appeals.

In August 1985, Wildenberg moved to Minnesota from Green Bay, Wisconsin, to attend school at Bethel College in Arden Hills, Minnesota. Wildenberg met K.A. in June 1986, when he began employment as a gymnastics coach at the Northwest YMCA ("YMCA") in Shoreview, where she was taking lessons. Wildenberg was 18 years old and K.A. was 9 years old at that time. Wildenberg coached K.A. at the YMCA from August 1986 until he left employment there in May 1988. During that time, Wildenberg became acquainted with K.A.'s mother. When Wildenberg stopped coaching gymnastics at the YMCA, K.A.'s mother pulled K.A. and C.A., her younger daughter, out of the program. Because Wildenberg could not afford an apartment after he left his coaching job, K.A.'s mother offered to have him move in with her family after Bethel College let out in June 1988. In exchange for painting the family's house, Wildenberg was given a couch to sleep on in the family room which was located in the basement along with a bedroom occupied by K.A.'s brother. Wildenberg lived with K.A.'s family continuously from June 1988 to September or October of that year, and then lived with them intermittently until the fall of 1990.

During the summer of 1988, Wildenberg began coaching gymnastics at Forest Lake Flyaways ("Flyaways"), and both K.A. and her sister C.A. enrolled in that program so that Wildenberg could continue to coach them. K.A. practiced gymnastics at Flyaways after school for 4 hours per day, several days per week. Wildenberg took K.A. and her sister to and from practices on a regular basis, and also accompanied K.A. and her mother to doctor and dentist appointments. After practices, Wildenberg and K.A. often ate dinner together and then watched television in the family room, or he engaged in long conversations with K.A.'s mother.

K.A. testified that Wildenberg sexually abused her, on an almost nightly basis, from the time she was 11 or 12 years old, and in the sixth grade, until he moved out of her family's home when she was in the eighth grade. Wildenberg denied engaging in sexual acts with K.A. during that time period.[1] K.A. testified that the first incident of sexual abuse occurred when she was 11 or 12 years old, when Wildenberg put his hands under her shirt and touched her breasts one night after she had fallen asleep on the family room couch while watching television. K.A. stated that she awoke during this incident, but pretended to be asleep. She further testified that Wildenberg engaged her in acts of sexual intercourse and digital penetration, and that they performed acts of oral sex upon each other, beginning when she was 12 years old and continuing on an almost nightly basis until she was 14 or 15. K.A. testified that these sexual activities usually occurred late at night in her bedroom, on the family room couch, or in her brother's bedroom. K.A.'s sister C.A. and C.A.'s friend, M.F., each testified that when they were age 9 or 10 and 8 or 9, respectively, they looked through a 5-inch hole in the closet wall between C.A.'s and K.A.'s bedrooms and observed Wildenberg, naked, lying on top of K.A., also naked. The children's testimony regarding this event is somewhat confused. After observing the scene in K.A.'s bedroom, C.A. testified that the two girls ran next door and brought M.F.'s brother, T.F., age 10, back with them to view the scene. M.F., on the other hand, testified that it was on another occasion, when the girls viewed K.A. and Wildenberg in K.A.'s bedroom kissing, but not naked, that the two girls ran next door and brought T.F. back with them to view the scene. T.F. testified that on the occasion the

---

1. Wildenberg admitted to having sexual intercourse with K.A. in July 1994, several years later, when she was 17 years old.

two girls brought him over to K.A.'s house, he looked through the hole in the wall and also observed Wildenberg, wearing only a pair of briefs, lying on top of K.A., but it is not clear on which occasion this occurred. He testified he could not tell whether or not K.A. had any clothes on, however. Afterwards, the three children ran next door and T.F. told his parents. When T.F.'s parents told K.A.'s parents, they confronted Wildenberg and K.A. in their living room with K.A.'s family members and neighbors present. Wildenberg and K.A. denied that anything sexual had happened. K.A.'s mother believed them and accused C.A. of lying.

K.A. testified at length about her gymnastics training and Wildenberg's coaching. She thought he was a really good coach, but when she made mistakes, he would punish her by yelling at her, making her stay in the locker room, preventing her from competing in meets, or telling her mother, who then also yelled at her, and who, on one occasion at a gymnastics meet, slapped her for failing to perform up to expectations. In August 1991, K.A. left the gymnastics program when Wildenberg and Barbara Burdick, an owner of Flyaways, suggested that because K.A. was having trouble balking, i.e., failing to perform a known skill, she was disrupting the practice of the other students. Shortly thereafter, when K.A. was age 15, she began to experience depression and apparently attempted suicide, although the timing of the suicide attempt is not clear from the record. Also at about that time, when K.A. was in tenth grade, she told her high school friend, N.F., that she had been having sexual relations with Wildenberg.

The following year, 1992, K.A. began to see a counselor. She did not tell the counselor about the sexual abuse, and in fact denied that she had had sexual relations with Wildenberg when the subject was brought up by the counselor.

Wildenberg continued to have some contact with K.A. by telephone over the next 2 years. In 1994, when K.A. was 17, she went to Wildenberg's apartment and had sexual intercourse with him. She testified that she "didn't feel really right about it," but that she did it because he wanted her to. Wilden-

berg, on the other hand, testified that K.A. initiated the sexual encounter and it was the only time they had sexual relations. Wildenberg further testified that a couple of weeks following that incident, he rejected K.A.'s further sexual advances.

Aside from her friend N.F., K.A. told no one about her relationship with Wildenberg until her boyfriend J.C. asked her to explain why she had marked an "x" on her calendar. She began to cry and told him that it marked the day, about a month earlier, that she had sexual intercourse with Wildenberg and that Wildenberg had sexually abused her as a child. Her boyfriend told her mother, and her mother talked to her about the matter but they did not report it to the police until about a month later.

As part of the criminal investigation commenced as a consequence of the report to the police, at the suggestion of a Ramsey County investigator K.A. called Wildenberg on the telephone on February 9, 1995 and tape recorded a conversation in which K.A. attempted to elicit an incriminating statement from him. Over the course of the taped conversation, lasting approximately 37 minutes, K.A. told Wildenberg that she was in counseling and that the counselor wanted to see her journals from when she was in eighth grade—about the time Wildenberg moved out of K.A.'s home in 1991. Wildenberg responded that he did not know that she kept journals. K.A. confirmed that she did, and that she wanted to talk to him first before she gave them to her counselor because there was some "stuff" in them about him. Wildenberg expressed concern about getting "in trouble" and told her that if it were up to him, she would destroy the journals, or rip out the pages that were about him. He also said that his advice was based on his own self interest however, and if she needed to give the journals to her counselor in order to help her, then that decision was up to her. At one point in the conversation K.A. said, " * * * on one it says I thought I was pregnant you know * * * * Cuz I was scared you know? Remember that time? I don't know if you remember or not." Wildenberg replied, "No, I don't remember that, but you never would have been because we never had

intercourse." Then K.A. said, "We sort of did though." And he ·said, "No we didn't. Not until that one time you came over here" [apparently referring to the July 1994 incident when K.A. was 17]. Then K.A. said, "Yeah, I suppose, I didn't know although I was so little I couldn't tell the difference * * *." In the conversation regarding the journals, Wildenberg also said, "It's a can of worms though," and "I'm not gonna make an excuse for it that's all it was it was a mistake and I wish I could of expressed things differently and that might have changed alot [sic] of outcomes of stuff." K.A. replied, "Well, you mean like expressing feelings by, like, sexually," and he said, "Yeah."

At a pre-trial hearing, the court examined the journals *in camera* to determine whether there was anything in them that was relevant to the defense and concluded that there was not. Discovery was denied, as was Wildenberg's pre-trial motion for leave to cross-examine the investigating officer as to whether the journals made reference to the sexual abuse. At trial, the court ruled that Wildenberg could not ask K.A. about the contents of her journals or whether they even existed, reasoning that the references to the journals in the taped· conversation only related to Wildenberg's reaction to what might be in them and not to what, if anything, was in fact in them. The trial court did not review the journals apparently relying on the pre-trial court's determination they were irrelevant.

The journals were not admitted in evidence, but the taped conversation between K.A. and Wildenberg, replete with references to the journals, was admitted. There were no limiting instructions requested or given to the jury regarding the reference to the journals in the taped conversation.[2] After jury deliberation began, the jury requested and was permitted to hear again the taped conversation. Within 20 to 30 minutes thereafter, the jury returned a guilty verdict. The trial court sentenced Wildenberg to 86 months in prison, a double durational departure from the presumptive sentence under the sentencing guidelines in place at the time of the offense.

This court has ruled on numerous occasions that the trial court has wide discretion in its discovery and evidentiary rulings. *E.g., State v. Paradee,* 403 N.W.2d 640, 642 (Minn.1987). That discretion is subject to judicial review when, among other circumstances, it conflicts with a defendant's constitutional guarantees—as asserted here, Wildenberg's Sixth Amendment right to confront witnesses. The Confrontation Clause of the Sixth Amendment has been incorporated into the Fourteenth Amendment, and thus applies to criminal defendants in state proceedings. *Pointer v. Texas,* 380 U.S. 400, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965). "Normally the right to confront one's accusers is satisfied if defense counsel ·receives wide latitude at trial to question witnesses." *Pennsylvania v. Ritchie,* 480 U.S. 39, 53, 107 S.Ct. 989, 999, 94 L.Ed.2d 40 (1987) (citing *Delaware v. Fensterer,* 474 U.S. 15, 20, 106 S.Ct. 292, 294–95, 88 L.Ed.2d 15 (1985)). In *Ritchie,* the United States Supreme Court considered whether a defendant accused of sexually abusing his minor daughter was denied his right of confrontation under the Sixth Amendment when the trial court refused to order disclosure of the child protective agency's files including a report by an unidentified source that Ritchie's children had been abused. *Ritchie,* 480 U.S. at 43–44, 107 S.Ct. at 994. The Supreme Court held that the state had a compelling interest in protecting its child abuse information, and therefore the defendant's constitutional right of confrontation could be adequately protected by an *in camera* review of the agency's files by the trial court. *Id.* at 60–61, 107 S.Ct. at 1003.

A similar balance of interests was considered by this court in *Paradee,* where a victim's interest in confidentiality was balanced against a criminal defendant's right to discover relevant evidence. *Paradee,* 403 N.W.2d at 640. In *Paradee,* we followed *Ritchie* and concluded that for purposes of discovery, an *in camera* review of a child sex crime victim's confidential county welfare records adequately protected a criminal defendant's Sixth Amendment rights. *Paradee,* 403 N.W.2d at 642. Applying the princi-

---

**2.** Wildenberg's attorney made no objections re-

garding the taped conversation during the trial.

ple of balancing these conflicting interests here, we first observe that unlike the child protection files in *Ritchie* and *Paradee,* K.A.'s journals are not statutorily privileged. Nonetheless, since the state obviously has a compelling interest in protecting the privacy interests of an alleged child sex crime victim, we approve of the *in camera* review procedure used here, but the trial court's conclusions that the journals were not relevant was based on an erroneous analysis. The test of relevance was not Wildenberg's reaction when he learned of the journals, but rather whether the journals contained any probative evidence of whether Wildenberg in fact committed the sexual abuse with which he was charged.

■ In determining whether the journals contained relevant evidence, we first turn to the nature of the crime charged. Wildenberg was charged with first-degree criminal sexual conduct pursuant to Minn.Stat. § 609.342, subd. 1(g) (1992)—an offense requiring proof of sexual penetration with another person under age 16.[3] A variety of sexual acts meet the statutory requirement of sexual penetration including sexual intercourse, oral sex, or vaginal or anal penetration with a part of the body or an object, however slight.[4] Minn.Stat. § 609.341, subd. 12 (1992).

■ The journals[5] seem to indicate some kind of sexual activity was going on between K.A. and Wildenberg, but they make no reference to any conduct that would meet the statutory definition of sexual penetration with the exception of the noncriminal sexual intercourse that occurred when K.A. was age 17. They are replete with references to kissing and holding each other and Wildenberg coming to K.A.'s room in the middle of the night and lying with her. At one point there is a reference that " * * * Lyf put on a condom, I'm glad he did" in K.A.'s May 22, 1991 entry—suggesting that sexual intercourse might have occurred—but in the next sentence the journal goes on: "Then he just layed [sic] there holding me [and] he said that he misses that [and] I said so do I." Although these may be ambiguous statements as to whether sexual penetration occurred, they are relevant because they make a fact of consequence (whether sexual penetration occurred) more or less probable than it would be without the evidence. *See* Minn. R. Evid. 401 (regarding relevancy). While we acknowledge that not all relevant evidence in the hands of the prosecution is discoverable, where it is material to guilt or innocence, or to sentencing, denying access to the defendant unconstitutionally impairs the defense:

> [T]he Due Process Clause * * * require[s] that criminal defendants be afforded a meaningful opportunity to present a complete defense * * * * A defendant has a constitutionally protected privilege to request and obtain from the prosecution evidence that is either material to the guilt of the defendant or relevant to the punishment to be imposed.

*California v. Trombetta,* 467 U.S. 479, 485, 104 S.Ct. 2528, 2532, 81 L.Ed.2d 413 (1984).

> [E]vidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A "reasonable probability" is a probability sufficient to undermine confidence in the outcome.

3. Minnesota Statutes section 609.342, subdivision 1(g) (1992) provides:

> A person who engages in sexual penetration with another person is guilty of criminal sexual conduct in the first degree if any of the following circumstances exists:* * *
> (g) the actor has a significant relationship to the complainant and the complainant was under 16 years of age at the time of the sexual penetration. Neither mistake as to the complainant's age nor consent to the act by the complainant is a defense; * * *.

4. Minnesota Statutes section 609.341, subdivision 12 (1992) defines "sexual penetration" as: "sexual intercourse, cunnilingus, fellatio, anal intercourse, or any intrusion however slight into the genital or anal openings of the complainant's body by any part of the actor's body or any object used by the actor for this purpose * * *."

5. The journals came into the possession of the state when K.A. turned them over to a Ramsey County investigator and then became available for our review as confidential exhibits among the trial court file.

*United States v. Bagley,* 473 U.S. 667, 682, 105 S.Ct. 3375, 3383, 87 L.Ed.2d 481 (1985); *Ritchie,* 480 U.S. at 57, 107 S.Ct. at 1001.

We conclude that whether the journals were exculpatory, inculpatory, or neutral as to proof of the charged offense, the repeated references to their content in the taped telephone conversation and the almost daily references to K.A.'s intimate feelings about her relationship with Wildenberg in the journals makes them relevant, probative and admissible as to whether sexual penetration occurred as defined by the statute. Without the journals in evidence or K.A. subject to cross-examination regarding their content, the jury was left to speculate that they contained accounts of sexual intercourse, digital penetration and oral sex corroborating K.A.'s testimony when in fact no such explicit corroboration was to be found. Under the circumstances here, the balance of interests between protecting the privacy of the victim and the defendant's right to confront his accuser, tips heavily in favor of the latter; denying Wildenberg's right to inspect K.A.'s journals and to make such use of them in his defense as he might consider strategically advantageous within the parameters of applicable rules, was a clear infringement of Wildenberg's Sixth Amendment right of confrontation. Deprivation of the constitutional right of confrontation is however, subject to harmless error analysis. *See State v. Pride,* 528 N.W.2d 862, 867 (Minn.1995) (citing *Delaware v. Van Arsdall,* 475 U.S. 673, 684, 106 S.Ct. 1431, 1438, 89 L.Ed.2d 674 (1986)). The primary evidence here regarding whether sexual penetration occurred is K.A.'s testimony and her statement in the taped conversation that there was a time she thought she might be pregnant, and the testimony of K.A.'s sister C.A. and two neighbor children about what they saw when they looked through a hole in K.A.'s bedroom wall. Two of the child witnesses testified that they observed nudity and Wildenberg lying on top of K.A. The other one testified that he observed Wildenberg wearing briefs and lying on top of K.A., but could not see what, if anything, K.A. was wearing. K.A. too gave various descriptions of the event, including an acknowledgment that they may have been "somewhat naked." None of the witnesses testified as to whether sexual penetration occurred on that occasion as defined by Minn.Stat. § 609.341, subd. 12. The jury considered the taped conversation in which K.A. suggested that there was incriminating evidence in her journals, deliberated for some time, heard the taped conversation again, and 20 to 30 minutes later returned a verdict of guilty—but the jury never had access to the journals themselves because the trial court ruled them irrelevant. Applying our test for prejudicial error—"error will be found prejudicial if there is 'a reasonable possibility' that the error complained of might have contributed to the conviction," *see State v. Larson,* 389 N.W.2d 872, 875 (Minn. 1986)—we conclude that the trial court error in denying discovery of the journals and limiting cross-examination regarding them was clearly prejudicial because their exclusion from evidence could well have contributed to the conviction.

The dissent takes the view that the journals contained no exculpatory evidence; therefore denial of discovery did not violate Wildenberg's right of confrontation, and if his right to cross-examine K.A. regarding the journals was violated, it was harmless error. We fail to see how prohibiting admission of the journals in evidence and the opportunity to cross-examine K.A. as to them can be anything but unconstitutional, particularly where the jury was left to speculate as to an essential element of the offense—whether sexual penetration occurred. For example, should Wildenberg not have been permitted to develop in his defense that since it was not until May 31, 1994 that the journals made reference to having "sex" with Wildenberg, near the time when Wildenberg admitted it occurred—that the lack of reference to having sexual intercourse anywhere else in the journals is reliable evidence it did not occur? We think he should, as in the absence of any other explicit reference to having "sex" with Wildenberg in the journals, the journals can clearly be viewed as exculpatory. The comments of Chief Justice Burger in *Davis v. Alaska* are particularly appropriate here:

> We cannot speculate as to whether the jury, as sole judge of the credibility of a witness, would have accepted this line of

reasoning had counsel been permitted to fully present it. But we do conclude that the jurors were entitled to have the benefit of the defense theory before them so that they could make an informed judgment as to the weight to place on [the] testimony which provided "a crucial link in the proof * * * of petitioner's act."

415 U.S. 308, 317, 94 S.Ct. 1105, 1111, 39 L.Ed.2d 347 (1974).

Wildenberg is entitled to a new trial.

Affirmed.

KEITH, Chief Justice (dissenting).

I respectfully dissent. Due process does not require that the government provide the accused with any and all information which has the possibility of being relevant to the case. The scope of the constitutional protection is for exculpatory evidence: evidence which is "both favorable to the accused and material to guilt or punishment." *Pennsylvania v. Ritchie,* 480 U.S. 39, 57, 107 S.Ct. 989, 1001, 94 L.Ed.2d 40 (1987). Evidence qualifies as material exculpatory evidence if there is a reasonable probability that the result of the proceeding would have been different had the evidence been disclosed. *State v. Clobes,* 422 N.W.2d 252, 255 (Minn. 1988) (citing *United States v. Bagley,* 473 U.S. 667, 682, 105 S.Ct. 3375, 3383, 87 L.Ed.2d 481 (1985)). In this case, it is beyond doubt that the journals sought by the defense were in no way favorable to the accused as to the issue of whether he violated Minn.Stat. § 609.342, subd. 1(g) and would not have changed the outcome of the defendant's trial.

The journals trace a sexual relationship between the defendant and the pubescent complainant over a number of years, as well as the profound, detrimental effect that this relationship had on the complainant. Numerous journal entries relate how the defendant would enter the complainant's bedroom late at night or stay with her in the television room in the basement after the other family members had gone to sleep and would become intimate with her. For example, on May 21, 1991, the complainant describes how the defendant took advantage of the fact that her mother was on the phone to enter her room and kiss her and how, the same night, "Lyf came up to my room [and] everyone was sleeping and he stayed there [with] me in my bed for about an hour then left." The journal then indicates that the following night "about 1:00 Lyf came into my room [and] kissed me [and] told me to come downstairs [and] so I went down there and Lyf put on a condom, I'm glad he did. Then he just layed [sic] there holding me [and] he said that he misses that [and] I said so do I." Other entries also attest to the physical nature of the contact. On July 19, 1991, the complainant writes how the defendant told her that "I look good, I smell good [and] I taste good." On August 20, 1991, the complainant expresses her concern that she has not had her period in several months and might be pregnant, stating "If I'm pregnant I'll drop dead right here [and] now."

As the complainant grew older, her intimations in the journals about the nature of her contacts with the defendant became more direct. On April 8, 1993, the complainant writes about the defendant, "And all he likes me for is my body, but he will never ever touch it again." On April 13, 1993, she writes, "[H]e sure isn't gonna be f___king me in the near future. Even though he thinks he is. He's not." On May 31, 1994, the complainant writes about the sexual encounter that occurred with the defendant after she turned seventeen. However, the journal entry reveals more about what occurred when the complainant was younger, "I actually let myself believe that Lyf cared for me awhile again but it's just the same * * * thing. All he wants me for is sex. * * * I just don't think of him as a friend anymore [and] I'll never trust him again cuz this is the second time now."

These journals clearly attest to the ongoing, sexual relationship between the defendant and the complainant and, as such, incriminate, rather than exculpate, the defendant. The journals' reference to the use of a condom, the defendant "tasting" the complainant, and the complainant's fear of pregnancy, and the reference to "f___ing" strongly indicate that sexual pen-

etration occurred.[1] The journals' lack of detailed anatomical descriptions of the sex acts or the use of the word "sex" to describe the acts in a later journal but not in earlier ones are simply neutral facts which in no way negate the crime charged. Even if the journals' lack of detail were considered to have some exculpatory value, there is no reasonable probability that the admission of the journals would have changed the verdict of the jury. Rather, the admission of the journals would have strengthened the prosecution's case by corroborating the complainant's testimony and the testimony of other witnesses.

The admission of the journals would have corroborated the complainant's testimony that she was only eleven or twelve when the sexual exploitation began. In one entry of May 1993, complainant wrote, "I hate Lyf so much. * * * Why did he f___ing have to do that to me. He ruined my life. * * * God, I was only 12 f___ing [years] old." The journals would have also corroborated the complainant's testimony regarding the defendant's modus operandi in sneaking into her room late at night and her testimony regarding the circumstances under which she and the defendant engaged in sexual activity in her older brother's room. On May 28, 1991, the complainant wrote, "My mom and my brother went to the lake cabin [and] my Dad went on Saturday night. Me [and] Lyf [and] my sister stayed home. In the morning, I went downstairs [and] me [and] Lyf stayed down there [and] then we went in [brother's] room so [sister] wouldn't come in on · us * * *." Additionally, the August 20, 1991

journal entry stating the complainant's fear of pregnancy resulting from her overdue menstrual period would have corroborated complainant's testimony and statement in her phone call to defendant that she feared pregnancy following sexual intercourse with the defendant. The journals would have also corroborated complainant's testimony about the bad, guilty feelings that grew over time as the complainant matured and wrestled with her feelings about the sexual acts of the past. On June 14, 1993, the complainant wrote "Lyf couldn't do anything or say anything right now to make me not hate him. I can't believe what he did. * * * I wonder if he ever worries about me telling someone the truth about him. He would have no life left then. He'd be in jail."

In addition to the corroboration of the complainant's testimony by the journals, the corroborating testimony of the complainant's sister and other witnesses placed the overwhelming balance of the evidence in favor of the state: the testimony of childhood neighbors that they saw the defendant, with little or no clothes on, laying on top of the complainant and kissing her in her bed; the complainant's sister's testimony that she frequently saw the defendant and the complainant lying close together on the couch with a blanket over them; complainant's high school friend's testimony that, at the age of fifteen or sixteen, the complainant showed her semen stains on her bedspread and told her that complainant and defendant had performed oral sex on each other and that the defendant had "put his penis into her and

---

1. Statements similar to these would be sufficient, if made at trial under oath, to support a jury's determination that penetration occurred. This court elaborated on the specificity of testimony necessary to establish sexual penetration in State v. Steinbrink, 297 N.W.2d 291, 292 (Minn.1980):

   With respect to the more serious offense, defendant contends that the evidence failed to establish penetration because the complainant, age 15, while testifying that "sexual intercourse" occurred, was not asked to explain what she meant by "sexual intercourse."

   The general view is that "proof of penetration need not be in any particular form of words," 75 C.J.S. Rape § 71 (1952), and there are many cases saying that testimony by a complainant that the accused had "sexual intercourse" or "intercourse" with her or

"raped" her is sufficient, if believed, to establish penetration. See, e.g., Lindsey v. State, 257 Ind. 78, 272 N.E.2d 458·(1971) (16–year–old complainant's use of terms such as "intercourse" interpreted in context of case to mean sexual intercourse involving defendant's male sex organ penetrating complainant's female sex organ). * * *

   Of course, testimony such as this has to be considered not in the abstract but in the context of the particular case.

   In the context of the journals' recounting of how the defendant entered her bedroom and lay with her late at night, the references to putting on a condom and fears about pregnancy clearly indicate what the complainant found unnecessary to expressly state to herself, that sexual intercourse occurred.

they had sex,"[2] and the defendant's own admissions in a phone conversation with the complainant.[3] The explicit testimony of the complainant and her high school friend as to the sexual acts committed by the defendant provided the jury ample evidence that sexual penetration occurred; hence, the jury was not left to speculate on this issue.

In addition, the defendant did not suffer any violation of his Sixth Amendment right to confrontation by the trial court's limiting his cross-examination on the subject of the journals. "[T]he Confrontation Clause guarantees an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." *Delaware v. Fensterer*, 474 U.S. 15, 20, 106 S.Ct. 292, 294, 88 L.Ed.2d 15 (1985) (emphasis in original). The trial court has wide latitude to impose reasonable limits on cross-examination based on concerns about prejudice, confusion of the issues, or "interrogation that is repetitive or only marginally relevant." *Delaware v. Van Arsdall*, 475 U.S. 673, 679, 106 S.Ct. 1431, 1435, 89 L.Ed.2d 674 (1986). The trial court prohibited cross-examination on the content of the journals based on its determination that their content was irrelevant to proving whether the abuse actually occurred because, unlike business records, the journals were unreliable as a source of factual record. I agree with the trial court that the journals were only marginally relevant and would have been likely to distract the jury from the true issue at hand; whether

the defendant violated Minn.Stat. § 609.342, subd. 1(g).

The defendant argues that the trial court "opened the door" for cross-examination on complainant's journals by admitting the tape of the telephone conversation between the defendant and the complainant discussing whether the complainant should present the journals to her therapist. However, the trial court instructed counsel to limit the use of the tape to showing the state of mind of the defendant upon hearing that some record of his actions might have been made. The prosecutor followed this instruction, restricting her remarks about the journals in her opening and closing statements to the defendant's reactions.[4] The damning effect of the taped conversation lay in the defendant's hasty reaction to learning of the possibility of a record, rather than in the complainant's oblique references to her journals. Virtually within seconds of the complainant telling the defendant that she had started writing journals in the eighth grade and that one of the journals contained information about the instance when the neighbor children witnessed them together on complainant's bed, the defendant told the complainant, "I'd destroy those if I were you * * *."

Furthermore, even if it was error to prevent cross-examination on this narrow issue, the error was harmless beyond a reasonable doubt. "The correct inquiry is whether, assuming that the damaging potential of the cross-examination were fully realized, a re-

---

2. Although the high school friend had told investigators originally that complainant and defendant almost had sex, she cleared up this ambiguity in her testimony, stating that complainant told her that in the beginning, she and defendant would come close to having sex, but didn't, but then at one point they did have "actual sex." Confusion over this point likely stemmed from the fact that defendant was not able to *completely penetrate* the complainant vaginally and therefore, the complainant did not believe that this qualified as "sex." Complainant expressed this misconception in her phone conversation with the defendant, when she mentioned that the journal related an instance in which she thought she was pregnant. When the defendant responded that she couldn't have been pregnant because they didn't have intercourse, complainant responded "We sort of did though." When defendant again denied having intercourse, the complainant stated "Yeah, I suppose, I didn't know

although I was so little I couldn't tell the difference."

3. The defendant expressed his fear of getting into trouble over the contents of the journals because "it happened when you weren't eighteen." He also apologizes to the complainant stating, "And you know I can't[,] I'm not gonna make an excuse for it that's all it was it was a mistake and I wish I could of expressed things differently * * * ." When the complainant asked him if he meant expressing his feelings sexually, the defendant responded in the affirmative.

4. The defendant did not request that the court provide the jury with a limiting instruction regarding the use of the tape pursuant to Minn. R. Evid. 105 and therefore, the court did not give one.

viewing court might nonetheless say that the error was harmless beyond a reasonable doubt." *Delaware v. Van Arsdall,* 475 U.S. at 684, 106 S.Ct. at 1438. Whether an error is harmless in a particular case depends upon factors such as the importance of the witness's testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of corroborating or contradicting evidence on material points, the extent of cross-examination otherwise permitted, and the overall strength of the prosecution's case. *Id.*

Cross-examination on the content of the complainant's journals would not have damaged the prosecution's case, but on the contrary, would have only strengthened it by corroborating the testimony of the complainant and other witnesses. Additionally, the fact that the defendant had a full opportunity to cross-examine the complainant regarding the alleged abuse and develop his theories as to complainant's motives for testifying minimized any possibility for prejudice stemming from this narrow limitation on cross-examination. Given the strength of the prosecution's case and the corroborating testimony on the material fact of penetration previously noted, it was harmless beyond a reasonable doubt to limit cross-examination on the issue of the contents of the complainant's journals.

In sum, I fail to see how the defendant's week-long trial was anything less than fair when the defense had ample opportunity to cross-examine the complainant and the corroborating witnesses at length regarding the details of the alleged sexual abuse and when the evidence excluded was unreliable, hearsay evidence which was overwhelmingly harmful and incriminating to the defendant.

BLATZ, Justice (dissenting).

I join in the dissent of Chief Justice KEITH.

ANDERSON, Justice (dissenting).

I join in the dissent of Chief Justice Keith. As the Chief Justice states in his dissent, "due process does not require that the government provide the accused with any and all information which has the possibility of being relevant to the case." To fall within the constitutional protection, the evidence must be exculpatory, that is, "both favorable to the accused and material to guilt or punishment." *Pennsylvania v. Ritchie,* 480 U.S. 39, 57, 107 S.Ct. 989, 1001, 94 L.Ed.2d 40 (1987). *See also State v. Paradee,* 403 N.W.2d 640, 641–42 (Minn.1987) (advocating in camera review of private matters). The district court has the power to control the scope of cross-examination by prohibiting questions that are prejudicial, irrelevant, or otherwise improper. *Ritchie,* 480 U.S. at 53 n. 9, 107 S.Ct. at 999 n. 9. Using the words of *Ritchie,* the information in the complainant's journals is neither *favorable* nor *material* to the defendant's case. Entries in the journals corroborate the complainant's testimony that sexual penetration occurred, and these statements, if made at trial under oath, may well have been sufficient to support the jury's determination that sexual penetration occurred. *See State v. Steinbrink,* 297 N.W.2d 291, 292 (Minn.1980). There is no reasonable probability that if the defendant had access to the journals, the result of the proceeding would have been different. The district court did not err in denying the defendant access to the journals.

I am writing separately, however, to express my concern about defendant's assertion in his brief that the judge who presided at defendant's trial "refused even to review the journals to determine whether they were discoverable * * *." When defendant made a pretrial motion to obtain access to certain information, including the journals, the judge who heard this motion examined the journals in camera. That judge held that the journals were not discoverable. Just prior to trial, the state moved in limine to prevent the defendant from inquiring into or eliciting testimony regarding the journals or their contents. A different judge—the judge assigned to preside at the trial—heard this motion. Based upon information gleaned from a psychologist's notes and a police investigative summary, defendant made an offer of proof that the journals did not include any reference to defendant's engaging in sexual penetration with complainant. Defendant argued that the alleged silence in the journals, which were prepared contemporaneously

with the events alleged to have occurred, was probative and exculpatory.

The record is unclear whether the judge who heard this later motion examined the journals. There is some evidence in the record that he did not. It is troubling if the judge who heard the motion and presided at trial did not review the journals. We said in *Paradee* that "the duty to disclose [probative materials] is ongoing; information that may be deemed immaterial upon original examination may become important as the proceedings progress, and the court would be obligated to release information material to the fairness of the trial." 403 N.W.2d at 641 (quoting *Ritchie,* 480 U.S. at 60, 107 S.Ct. at 1003). While the record makes it clear in this case that any failure of the presiding judge to review the journals did not result in error, trial judges should be vigilant in their review of materials alleged to be probative so that the possibility of future errors may be avoided.